UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARLO FIELDS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 21-cv-2058 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| VICTORIA KLEGMAN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**MEMORANDUM OPINION AND ORDER**

One summer day, Treja Kelley and her cousin, Christopher Fields, were standing with a group of teenagers on a neighborhood street in Chicago. And then shots rang out. Someone opened fire into the crowd. Fields shielded Kelley from the gunfire – acting selflessly in a moment of crisis, putting himself in grave danger. He protected her, but it cost him his life.

Kelley got a good look at the assailant, and she identified Deonte Davis as the shooter in a lineup later that day. Davis was arrested and charged with first degree murder. Years later, Kelley received a trial subpoena, and ultimately testified as a critical witness. She identified Davis as the shooter, and Davis was convicted.

Kelley feared retaliation, so she requested police protection before and after the trial. A Cook County prosecutor, Victoria Klegman, denied both requests. The prosecutor assured Kelley that she was not in any danger.

Davis, meanwhile, moved for a new trial. And ominously, he divulged in a recorded prison call that he wanted to prevent a "female witness" from testifying again. The prosecutor knew about the motion and the recording, but didn't tell Kelley anything about it.

Almost three months after she testified, tragedy struck again. An assailant shot and killed Kelley. For the second time, the family grieved an unspeakable loss.

Her mother, Marlo Fields, ultimately brought this suit against Klegman and other unknown state agents at Cook County, alleging a state-created danger under the Due Process Clause. Klegman moved to dismiss for failure to state a claim.

For the reasons that follow, the motion to dismiss is granted.

### Background

At the motion to dismiss stage, the Court must accept as true the well-pleaded allegations of the complaint. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

Plaintiff Marlo Fields is the personal representative of the estate of Treja Kelley, who is deceased. *See* Cplt., at ¶ 2 (Dckt. No. 1). Fields is Kelley's mother. *See* Pl.'s Mtn. to Stay, at ¶ 6 (Dckt. No. 9).

In June 2016, Deonte Davis fired shots into a crowd of teenagers enjoying themselves on the streets of Chicago. *See* Cplt., at ¶ 5 (Dckt. No. 1). The group included Kelley and her cousin, Christopher Fields. *Id.* They were 15 and 17 years old, respectively. *Id.* They were teenagers full of potential, with their whole lives ahead of them.

During the shooting, Christopher Fields put himself in harm's way to protect Kelley from the gunfire. *Id.* He saved her, but he could not save himself. *Id.*

Later that day, Kelley viewed a lineup and identified Davis as the shooter. *Id.* The police arrested Davis that evening and charged him with first degree murder. *Id.*

Almost three years later, in April 2019, Kelley received a subpoena to testify at Davis's criminal trial. *Id.* at ¶ 7. After receiving the subpoena, Kelley and Marlo Fields (again, her mother) asked Defendant Victoria Klegman – a Cook County prosecutor – for police protection for Kelley. *Id.* at ¶¶ 3, 8. Apparently, an investigation into the shooting revealed Davis's connection with a street gang, so Kelley worried that testifying would make her a target. *Id.* Klegman denied the request. *Id.*

Kelley complied with the subpoena, did her civic duty, and testified at Davis's trial. *Id.* at ¶ 9. In fact, Kelley was the only eyewitness subpoenaed for the trial, and her testimony was a crucial part of the prosecution's case. *Id.* Davis was convicted of first degree murder. *Id.*

Shortly after trial, Kelley and her mother approached the prosecutor once again. *Id.* at ¶ 10. Kelley feared for her safety and asked for police protection a second time. *Id.* Klegman reassured her that there was "less than [a] 1% chance that anything would happen" and that there would be "no retaliation" after Davis's incarceration. *Id.* So Klegman denied the second request for protection.

Davis later moved for a new trial. *Id.* at ¶ 11. Around that time, the jail recorded a conversation in which Davis asked how to prevent the "female civilian witness" from testifying. *Id.* Klegman and others in the Cook County State's Attorney's Office knew about Davis's motion and the recording, but they didn't tell Kelley. *Id.* at ¶ 12.

Kelley's worst fears came true in September 2019, roughly three months after she testified. She was shot five times and killed by an unknown assailant. *Id.* at ¶ 13. Kelley was pregnant at the time of her death, and her unborn child was also killed. *Id.*

The police investigated and apprehended Kavarian Rogers for Kelley's murder in April 2020. *Id.* at ¶ 14. Rogers was arrested on the grounds that he was hired to "execute" Kelley to

keep her silent.  *Id.*  Rogers purportedly told others that he was paid to kill "a girl who testified against somebody."  *Id.*

Fields filed this action on behalf of Kelley's estate.  She brought one count under 42 U.S.C. § 1983 against Klegman and John Doe(s) and Jane Doe(s), in their individual and official capacities as agents of Cook County.  *Id.* at ¶¶ 15–21.  She alleged that Klegman and other unknown state actors violated Kelley's due process rights by creating a danger, and by failing to protect her from that danger, after she testified against Davis.[1]  *Id.* at ¶ 20.

Klegman moved to dismiss the complaint for failure to state a claim.  *See* Defs.' Mtn. to Dismiss (Dckt. No. 6).  The unidentified John Doe and Jane Doe defendants obviously did not respond, but the complaint alleges that the claims against them are functionally the same as the claim against Klegman.  *See* Cplt., at ¶ 4 (Dckt. No. 1) (alleging that the John Doe and Jane Doe defendants "had knowledge and committed acts similar and on par with those alleged against Klegman").  So the Court will consider them all together.

In response to the motion, Fields agreed to dismiss without prejudice the claims against Klegman in her official capacity.  So the official capacity claims against the Defendants are dismissed.[2]  *See* Pl.'s Resp. to Defs.' Mtn. to Dismiss, at 6 (Dckt. No. 17).

### Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not the merits of the case.  *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510,

---

[1]  The complaint also alleges in passing that Defendants violated Kelley's Eighth Amendment rights.  *See* Cplt., at ¶ 20 (Dckt. No. 1).  There is no state-created-danger claim sounding in the Eighth Amendment, and neither party ever discusses the Eighth Amendment in their briefs.  Kelley was never imprisoned, either, so she could not suffer punishment within the meaning of the Eighth Amendment.  The Court *sua sponte* dismisses any claims based on the Eighth Amendment.

[2]  If Fields intended to drop the official capacity claim against Klegman (only), but retain the official capacity claims against the unknown defendants, then Fields can file a motion for leave to amend.  But the complaint alleges that they are similarly situated, so the result presumably should be the same.

4

1520 (7th Cir. 1990). In considering a motion to dismiss, the Court must accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive, the complaint must give the defendant fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

When reviewing a motion to dismiss under Rule 12(b)(6), the court may consider "the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012).

## Analysis

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." *See* U.S. Const. amend. XIV, § 1. For present purposes, the key word is the "State" – no "*State*" shall deprive a person of freedom. *Id.* (emphasis added). The provision is about protecting We The People from government power. It is not about protecting people from other people.

The Due Process Clause of the Fourteenth Amendment "is a restraint upon *governmental* action," so it "does not impose a duty on the state to protect against injuries inflicted by private actors." *See First Midwest Bank, Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021) (emphasis in original). The purpose of the Due Process Clause is "to protect the people from the State, not to ensure that the State protect[s] them from each other." *See*

5

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989); *see also First Midwest Bank*, 988 F.3d at 987 ("The state does not have a due-process duty to protect against acts of private violence.").

"Although the Due Process Clause of the Fourteenth Amendment prevents the state from infringing on an individual's right to life, liberty, or property, it does not impose an affirmative obligation on the state to ensure that those interests do not come to harm through other means." *D.S. ex rel. Stahl v. E. Porter Cnty. Sch. Corp.*, 799 F.3d 793, 798 (7th Cir. 2015) (cleaned up). "The bill of rights protects people from the government but does not oblige the government to furnish protection against private violence. In this sense the Constitution is a charter of negative liberties." *Witkowski v. Milwaukee County*, 480 F.3d 511, 512 (7th Cir. 2007).

Courts have recognized two limited exceptions when a party can bring a due process claim against a state actor for an injury at the hands of a private party. The first is the so-called "special relationship" exception, which really means a custodial exception. *See Paine v. Cason*, 678 F.3d 500, 510 (7th Cir. 2012) ("Some decisions call this a special-relationship exception to *DeShaney,* but we prefer to avoid the jargon. There's no need to hunt for 'special relationships' (what makes one 'special,' anyway?), and it is misleading to treat augmented risk as an 'exception' to *DeShaney*."). Basically, the state must protect people in its custody.

The exception recognizes that "when a state has custody over a person, it must protect him because no alternate avenues of aid exist." *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009). The special relationship exception applies in custodial settings, such as a case about an inmate attacking another inmate, so it does not apply here. *See, e.g.*, *K.H. ex rel. Murphy v. Morgan*, 914 F.2d 846, 849 (1990) (noting that when the state places a

6

person in danger in a custodial setting, "the state would be a doer of harm rather than merely an inept rescuer, just as the Roman state was a doer of harm when it threw Christians to lions").

The second exception involves a "state-created danger." *See Doe v. Village of Arlington Heights*, 782 F.3d 911, 916–17 (7th Cir. 2015). The state-created danger exception appears to have originated from a few sentences in the Supreme Court's decision in *DeShaney*.

There, the Supreme Court rejected a substantive due process claim against social workers who failed to intervene to protect a child from abuse by his father. *See DeShaney*, 489 U.S. at 192–94. The mother claimed that child-welfare caseworkers had reason to suspect abuse, but did nothing to protect the child from violence at the hands of his father. *Id.*

The Supreme Court concluded that, "[a]s a general matter," a "State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197. The Supreme Court rooted its holding in the constitutional text, which protects the people from the state, but does not require the state to protect people from other people. "[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *Id.* at 195. That is, the Due Process Clause "forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." *Id.*

*DeShaney* held that the Due Process Clause does not impose a freestanding duty on the part of the government to protect members of the public from harming each other. *Id.* at 196. And because "the State had no constitutional duty to protect Joshua against his father's violence,

7

its failure to do so – though calamitous in hindsight – simply does not constitute a violation of the Due Process Clause." *Id.* at 202.

Along the way, the Supreme Court noted that the state itself had not created the danger to the child. "While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him more vulnerable to them." *Id.* at 201; *see also id.* at 197 (noting that "petitioners concede the State played no part in creating" the danger); *id.* at 201–02 ("It may well be that, by voluntarily undertaking to protect Joshua against a danger it concededly played no part in creating, the State acquired a duty under state tort law to provide him with adequate protection against that danger.").

The Supreme Court noted in passing that the state "played no role in the[] creation" of the dangers. *Id.* at 201. That caveat became the toehold for the state-created danger doctrine.

The key sentence came in the context of explaining why the case was different than cases involving a custodial setting, as the surrounding text – including the preceding paragraphs, and the topic sentence of the paragraph in question – make clear. *Id.* The opening sentences reveal that the Supreme Court was distinguishing the case from a custodial setting. *Id.* ("The *Estelle–Youngberg* analysis simply has no applicability in the present case. Petitioners concede that the harms Joshua suffered occurred not while he was in the State's custody, but while he was in the custody of his natural father, who was in no sense a state actor.").

*DeShaney* is, perhaps, an awkward source for the state-created danger doctrine. After all, the case repudiated the notion that the state could have liability for failing to prevent bad acts by private actors. *See Est. of Romain v. City of Gross Pointe Farms*, 935 F.3d 485, 493 (6th Cir. 2019) (Murphy, J., concurring) ("In many respects, *DeShaney* is a surprising source for this right. More than any other case, that decision teaches that the Due Process Clause's text –

8

focused on *state* deprivations of life, liberty, or property without adequate process – makes the clause a poor fit for claims that the state refused to protect a person from *private* deprivations of life, liberty, or property.") (emphasis in original).

The Supreme Court did not weigh-in on how, if at all, the outcome would have been different if the state had created the danger. The Supreme Court simply noted that the state did not create the danger. The Supreme Court did not come out and say that if the state plays a role in creating or increasing the danger, then the state itself has "deprive[d] any person of life" within the meaning of the Due Process Clause. *See* U.S. Const. amend. XIV, § 1. At most, the Supreme Court "hinted that the Constitution *might* support liability," but that's about it. *See Weiland v. Loomis*, 938 F.3d 917, 921 (7th Cir. 2019) (emphasis in original).

Be that as it may, in the intervening decades, a considerable body of law has taken root and branched out. A due process claim about a state-created danger has three elements: "(1) the government, by its affirmative acts, created or increased a danger to the plaintiff; (2) the government's failure to protect against the danger caused the plaintiff's injury; and (3) the conduct in question 'shocks the conscience.'" *Est. of Her v. Hoeppner*, 939 F.3d 872, 876 (7th Cir. 2019) (quoting *Flint v. City of Belvidere*, 791 F.3d 764, 770 (7th Cir. 2015)); *see also Johnson v. Rimmer*, 936 F.3d 695, 708 (7th Cir. 2019); *but see Weiland*, 938 F.3d at 920–21 (casting doubt on whether the three-part test is properly rooted in *DeShaney*, without resolving the issue).

The state-created danger exception is "quite narrow" and reserved for "egregious" conduct by public officials. *See Est. of Her*, 939 F.3d at 876 (citing *Doe*, 782 F.3d at 917). A person bringing a state created danger claim faces a "difficult road." *See Jackson v. Indian Prairie Sch. Dist. 204*, 653 F.3d 647, 654 (7th Cir. 2011); *see also Est. of Allen v. Rockford*, 349

F.3d 1015, 1022 (7th Cir. 2003) ("[C]ases in which we have either found or suggested that liability attaches under the 'state-created danger' exception are rare and often egregious.").

Fields's complaint fails to state a claim, based on all three elements.

## I.    Creating the Danger

First, the complaint does not allege facts showing that Klegman affirmatively created or increased a danger to Kelley.  The two gunmen posed a danger to Kelley, and the state did not create that danger.

"A plaintiff must show that the state affirmatively placed him in a position of danger and that the state's failure to protect him from that danger was the proximate cause of his injury." *First Midwest Bank*, 988 F.3d at 988.  Courts often say that the state "must create or increase a danger" faced by an individual.  *See, e.g.*, *Johnson*, 936 F.3d at 708; *King ex rel. King v. E. St. Louis Sch. Dist. 189*, 496 F.3d 812, 818 (7th Cir. 2007).

But the standard "create *or increase* must not be interpreted so broadly as to erase the essential distinction between endangering and failing to protect."  *See Sandage v. Bd. of Comm'rs*, 548 F.3d 595, 599 (7th Cir. 2008) (emphasis in original); *see also Doe*, 782 F.3d at 917.  "The former may amount to a constitutional violation if other facts are present; the latter is simple negligence."  *Est. of Her*, 939 F.3d at 877.  "If all that were required was a causal relation between inaction and harm, the rule of *DeShaney* would be undone . . . ."  *Sandage*, 548 F.3d at 599.

So, "[w]hen courts speak of the state's 'increasing' the danger of private violence, they mean the state *did something* that turned a potential danger into an actual one, rather than that it just stood by and did nothing to prevent private violence."  *Id.* at 600 (emphasis added); *see also Buchanan-Moore*, 570 F.3d at 827 ("[T]he so-called state-created danger exception provides

that 'liability exists when the state affirmatively places a particular individual in a position of danger the individual would not otherwise have faced.'"); *Paine*, 678 F.3d at 510 ("Several decisions in this and other circuits hold that people propelled into danger by public employees have a good claim under the Constitution.").

The state creates or increases a danger by taking away a person's ability to protect himself or herself. *See Witkowski*, 480 F.3d at 513 ("[T]he Constitution does not require the government to protect citizens from privately created danger. It may, however, demand protection if the state disables people from protecting themselves; having rendered someone helpless, the state must supply the sort of defenses that the person could have provided on his own."); *Weiland*, 938 F.3d at 921 ("Several decisions in this circuit find liability outside of prisons when the state has disabled or undermined self-help or sources of private assistance."); *Monfils v. Taylor*, 165 F.3d 511, 517 (7th Cir. 1998).

A good example is *Vaughn v. City of Chicago*, 2014 WL 3865838 (N.D. Ill. 2014). There, the police ordered Vaughan, at gunpoint, to put down a stick that he was carrying for self-protection during a fight. *Id.* at *1. When he put it down, someone attacked him with a baseball bat. The state created the danger by taking away his defenses. *Id.* at *2–3; *see also McDowell v. Village of Lansing*, 763 F.3d 762, 766–67 (7th Cir. 2014) (addressing a person who followed the orders of the police to get on the ground after being chased, and who then got kicked in the head).

The state also creates or increases a danger by putting someone in a precarious spot, such as leaving a vulnerable person on a roadside late at night, or dumping him in the middle of the wilderness, or putting him in a snake pit. *See, e.g.*, *Paine*, 678 F.3d at 511 ("[I]t *is* clearly established that the police may not create a danger, without justification, by arresting someone in

11

a safe place and releasing her in a hazardous one while unable to protect herself . . . .") (emphasis in original); *Reed v. Gardner*, 986 F.2d 1122, 1126 (7th Cir. 1993) (discussing drunk passengers in a car, after arresting the driver); *Collignon v. Milwaukee County*, 163 F.3d 982, 987 (7th Cir. 1998) ("It would present a much different situation than we have here if a state actor 'released' a pre-trial detainee by, for example, dumping him in the wilderness."); *Witkowski*, 480 F.3d at 513 ("[I]f the state puts a man in a position of danger from private persons and then fails to protect him . . . it is as much an active tortfeasor as if it had thrown him into a snake pit.").

Fields argues that Klegman took steps that created or increased a danger to Kelley. The purported acts include: (1) subpoenaing Kelley to testify at Davis's criminal trial, and thus compelling Kelley to testify against her will; (2) refusing to provide Kelley with police protection before and after Davis's trial; (3) failing to inform Kelley that Davis had moved for a new trial; (4) telling Kelley that the risk of retaliation was less than one percent; (5) failing to inform Kelley about the recording of Davis expressing a desire to stop a female witness from testifying; and (6) failing to revisit the false assurances of safety after learning about the recording. *See* Pl.'s Resp. to Defs.' Mtn. to Dismiss, at 4 (Dckt. No. 17).

Nothing in that list is an act that created or increased a danger to Kelley. Many of them are not even *acts*. They're knowledge, followed by inaction. But the Supreme Court in *DeShaney* distinguished between acts and a failure to act. "In the substantive due process analysis, it is the State's *affirmative act* of restraining the individual's freedom to act on his own behalf – through incarceration, institutionalization, or other similar restraint of personal liberty – which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, *not its failure to act* to protect his liberty interests against harms inflicted by other means." *DeShaney*,

489 U.S. at 200; *see also Est. of Her*, 939 F.3d at 876 (stating that the state-created danger doctrine requires "affirmative acts" by the government).

Knowledge of danger, followed by inaction, cannot give rise to a claim. *DeShaney* put that question to bed. "The affirmative duty to protect arises *not from the State's knowledge* of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *DeShaney*, 489 U.S. at 200 (emphasis added). After all, *DeShaney* involved allegations that the case workers were "aware of the dangers that Joshua faced in the free world," but that awareness did not give rise to a claim. *Id.* at 201.

There is a difference between doing *nothing* and doing *harm*. Doing nothing cannot give rise to a claim, because inaction is not state action that deprives a person of life. But an affirmative act that makes the situation *worse* – by exposing the person to a new danger, or by placing the person in greater peril – potentially can give rise to a claim. The key principle is all too familiar: "do no harm."

Several of Klegman's allegations fall into that "knowledge plus inaction" bucket. For example, allegations about Klegman's knowledge – including knowledge about the motion for a new trial, and the recording, and so on – involved inaction. Allowing a claim to proceed based on those facts would erase the line drawn by the Seventh Circuit between action and inaction – between *creating* a danger and *failing to prevent* a danger. *See Sandage*, 548 F.3d at 599 ("If all that were required was a causal relation between inaction and harm, the rule of *DeShaney* would be undone . . . ."); *Windle v. City of Marion*, 321 F.3d 658, 662 (7th Cir. 2003) ("Appellant fails to grasp that she has to establish that the police failed to protect her from a danger *they created*

*or made worse*.  She confuses the inert failure to protect with the proactive creation or exacerbation of danger.") (emphasis in original).

Many of the allegations in the complaint are about inaction, meaning a failure to protect despite knowledge of a danger.  Putting inaction aside, the complaint alleges only two affirmative acts:  (1) subpoenaing Kelley to testify; and (2) telling Kelley that the risk was low.  Neither theory can give rise to a claim.

Serving a subpoena did not create or increase a danger to Kelley.  The danger was there when the shots rang out, and Kelley was in the line of fire.  She was in a dangerous position long before the trial subpoena arrived.[3]

Granted, testifying against the shooter is more dangerous than *not* testifying against the shooter.  So, in that limited sense, the government increased the danger.  But not everything that increases danger can give rise to a claim under the state-created danger exception.  Often, the state – through actions like subpoenas – must increase a danger for one person to decrease a danger for the whole community.  For example, sometimes "the government encourages a person to expose himself to danger . . . by asking [them] to participate in a drug sting as a confidential informant or accept a risky government job."  *Slade v. Bd. of Sch. Dirs.*, 702 F.3d 1027, 1032 (7th Cir. 2012).  But that request "does not create liability under the due process clause just

---

[3]  If serving a subpoena could give rise to a claim, one can imagine intractable problems with line drawing.  Is it a claim if the state serves a subpoena and forces a witness to walk through a minefield to get to the courthouse?  What about requiring the witness to get to the courthouse by walking through a public square with sniper fire (akin to Sarajevo in the 1990s)?  What about requiring the witness to testify against a dangerous person who puts a "hit" out on any witnesses?  Testifying against a dangerous person, without more?  Testifying in a courthouse in a bad neighborhood?  Testifying in a courthouse with asbestos?

because the danger materializes." *Id.*; *see also Dykema v. Skoumal*, 261 F.3d 701, 705–07 (7th Cir. 2001).[4]

Imposing liability on a prosecutor for issuing a subpoena would subvert an essential prosecutorial function, and thus undermine the criminal justice system.[5]  For that reason, courts do not apply the state-created danger doctrine to the act of compelling testimony.  *See Rivera v. Rhode Island*, 402 F.3d 27, 37 (1st Cir. 2005) ("Issuing a subpoena is also a vital prosecutorial tool.  While requiring [the plaintiff's] testimony may in fact have increased her risk, issuance of a subpoena did not do so in the sense of the state created danger doctrine.  Every witness involved in a criminal investigation and issued a subpoena to testify in a criminal proceeding faces some risk, and the issuance of a subpoena cannot become the vehicle for a constitutional claim against a state."); *Golian v. N.Y.C. Admin. for Child. Servs.*, 282 F. Supp. 3d 718, 731 (S.D.N.Y. 2017) ("The complaint contains no plausible allegation that Harper's subpoena of [the plaintiff] or any other action encouraged or officially sanctioned DeJesus's attack.  Rather, the subpoena served a legitimate function in the [Administration for Children Services'] pursuit of child neglect charges against DeJesus.").  It is not the sort of danger that the doctrine has in mind.

---

[4]  Maybe it turns on whether there is anything inherently dangerous about what the state is doing.  Is the state's action, at its very essence, dangerous?  Serving a subpoena is not an inherently dangerous activity, and neither is testifying in a courtroom.  But again, line drawing could become tricky, because it depends on how you define the activity in question.  Or, maybe it turns in part on the *immediacy* of the danger.  *Cf. Reed v. Gardner*, 986 F.2d 1122, 1127 (7th Cir. 1993) ("The dangers presented by drunk drivers are familiar and specific; in addition, the immediate threat of harm has a limited range and duration.").  Dropping someone off in the middle of the night in a dangerous neighborhood – without any ability to defend oneself – puts that person in harm's way, right then and there.  *See Paine*, 678 F.3d at 511.  The same cannot be said for serving a trial subpoena.

[5]  Defendants did not raise prosecutorial immunity, so the Court won't reach it.  *See Lewis v. Mills*, 677 F.3d 324, 330 (7th Cir. 2012) ("[P]rosecutors are entitled to absolute immunity when they are performing functions – such as determining whether charges should be brought and initiating a prosecution – 'intimately associated with the judicial phase of the criminal process.'") (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 270 (1993)).

A watered-down approach – where anything and everything that increases the marginal risk can give rise to a claim against the state – has another major problem. It risks losing sight of the fact that the Constitution is the source of the substantive right. And the Due Process Clause applies only if the state itself is the one who "deprive[s]" the person of life. *See* U.S. Const. amend. XIV, § 1. At some point, an in-for-a-penny, in-for-a-pound approach rests uneasily with the notion that the Due Process Clause is not about private conduct. Holding the state responsible when the incident predominantly involves private conduct will, at some point, stand the Constitution on its head.

The only remaining act is Klegman's alleged statements about the risk of future harm. According to the complaint, Klegman downplayed the danger of testifying. Klegman told Kelley that there was "less than a 1% chance that anything would happen," and that there would be "no retaliation" after Davis's trial.

As other courts have framed the issue, "the pivotal question is whether [the plaintiff] was safe before [defendant's] conduct and unsafe after." *See Spruill as next friend of D.N.S. v. Bd. of Educ.*, 2021 WL 1387949, at *5 (N.D. Ill. 2021) (Feinerman, J.) (emphasis omitted); *see also Doe*, 782 F.3d at 917 (noting that, in successful state-created danger cases, "the plaintiff was safe, or at least considerably safer, before the police acted than he or she was thereafter").

Fields argues that Klegman's statements about the risk of retaliation impacted Kelley's safety. She relies on a decision from another court in this district. *See Vaughn v. City of Chicago*, 2014 WL 3865838 (N.D. Ill. 2014).

As already explained, *Vaughn* involved a man who got caught in an altercation between two groups on the street while carrying a stick to protect himself. *Id.* at *1. When the police attempted to break up the fracas, an officer ordered Vaughn to drop the stick, twice. *Id.* Vaughn

complied, but after he dropped the stick, another man beat him to death with a baseball bat. *Id.* The officers did nothing to stop the man from killing Vaughn. *Id.*

In denying the defendants' motion to dismiss, the court reasoned that "Vaughn was safer with a stick in his hand than he was after Defendants ordered him to drop it. In simple terms, Defendants made Vaughn an easier target for would-be assailants in the rival group than he otherwise would have been. This marginal increase in risk is sufficient to state a plausible state-created danger claim." *Id.* at *3.

*Vaughn* is not remotely similar to the case at hand. *Vaughn* involved officers who pointed a gun and forced a person to drop his defenses. The police rendered him completely defenseless in the face of imminent peril. But here, the police did not prevent Kelley from protecting herself. There was a risk of future harm, but not an immediate one, and the state did not deprive her of self-defense.

The bottom line is that the state did not create the danger. The first gunman created a danger when he shot into the crowd. And the second gunman created a danger when he fired the bullets and prevented Fields from testifying again.

Kelley was in harm's way – twice – but it was not a harm created by the state itself. A private actor created the danger, so the estate has no claim against the state. *See Nelson v. City of Chicago*, 992 F.3d 599, 605 (7th Cir. 2021) ("Here, the danger was created by an armed robber, not by the government, so it is not covered by the doctrine."); *Doe*, 782 F.3d at 918 ("His alleged conduct did not turn a potential danger into an actual one; Doe was in actual danger already."). Kelley was already in harm's way, and the state did not put her there.

Taking a step back, it is worthwhile to look at the big picture, return to the constitutional text, and regain one's bearings. The Due Process Clause provides that "[n]o State shall . . .

17

deprive any person of life, liberty, or property, without due process of law." *See* U.S. Const. amend. XIV, § 1.  The state did not "deprive" Kelley of "life" in any meaningful sense.  She encountered danger on the streets of Chicago, and faced a continuing danger based on what she saw.  The loss of her life was a terrible tragedy, but the state itself did not take her life away.

## II.    Proximate Causation

The second requirement is causation.  The state-created danger doctrine applies only when the government's action was the "proximate cause" of the injury.  *See First Midwest Bank*, 988 F.3d at 987.

Proximate causation means that there are limits on holding someone responsible for what happens down the road.  "To satisfy the proximate-cause requirement, the state-created danger must entail a foreseeable type of risk to a foreseeable class of persons.  A generalized risk of indefinite duration and degree is insufficient."  *Id.* (citing *Buchanan-Moore*, 570 F.3d at 828–29).  The danger at issue must be "limited in both time and scope" to qualify.  *See Buchanan-Moore*, 570 F.3d at 828; *Reed*, 986 F.2d at 1127; *see also DeShaney*, 489 U.S. at 201 ("[T]he State does not become the permanent guarantor of an individual's safety by having once offered him shelter.").

For example, in *Martinez v. California*, 444 U.S. 277 (1980), the Supreme Court addressed a due process claim about the decision to parole an inmate, who killed someone five months later.  The Supreme Court rejected the claim on proximate causation grounds.  "Although the decision to release Thomas from prison was action by the State, the action of Thomas five months later cannot be fairly characterized as state action."  *Id.* at 284–85.  The death was "too remote a consequence of the parole officers' action to hold them responsible under the federal civil rights law," because it was "perfectly clear that not every injury in which a state official has

18

played some part is actionable" under section 1983.[6]  *Id.* at 285; *see also DeShaney*, 489 U.S. at

202 (favorably citing *Martinez*, 444 U.S. at 285).

In *Buchanan-Moore*, a mentally ill man with a history of violent attacks was arrested for

home invasion.  *See Buchanan-Moore*, 570 F.3d at 826.  The authorities ultimately released him

despite knowing about his violent history, even though he did not have his prescribed

medication.  *Id.*  Less than a month later, he shot and killed the plaintiff.  *Id.*  The Seventh

Circuit affirmed the dismissal of the complaint for lack of proximate causation.

Unlike cases involving the release of drunk drivers, which involve a threat of harm that is

"limited in both time and scope," *Buchanan-Moore* involved "no such limiting factors."  *Id.* at

828.  "[T]he danger was not of limited duration.  To the extent Gray posed any foreseeable

danger upon his release, it was a danger that was indefinite.  Gray's mental illness and propensity

for criminal acts existed without temporal boundaries."  *Id.* at 829.  Without time limits, the

death was "simply too remote a consequence of the County's actions to hold the County

responsible under the federal civil rights law."  *Id.*

The case at hand falls in the same category.  The complaint does not allege facts that

support the plausible inference that Klegman proximately caused Kelley's death.  The complaint

---

[6] *Compare Slade v. Board of School Directors of City of Milwaukee*, 702 F.3d 1027, 1033 (7th Cir. 2012)
(Posner, J.) ("Shouldn't it be enough to say that it violates the due process clause for a government
employee acting within the scope of his employment to commit a reckless act that by gratuitously
endangering a person results in an injury to that person?  Are there not virtues in simplicity, even in
law?"), *with DeShaney*, 489 U.S. at 202 ("But the claim here is based on the Due Process Clause of the
Fourteenth Amendment, which, as we have said many times, does not transform every tort committed by
a state actor into a constitutional violation.").  "Our Constitution deals with the large concerns of the
governors and the governed, but it does not purport to supplant traditional tort law in laying down rules of
conduct to regulate liability for injuries that attend living together in society.  We have previously rejected
reasoning that 'would make of the Fourteenth Amendment a font of tort law to be superimposed upon
whatever systems may already be administered by the States.' . . .  It is no reflection on either the breadth
of the United States Constitution or the importance of traditional tort law to say that they do not address
the same concerns."  *Daniels v. Williams*, 474 U.S. 327, 332–33 (1986) (rejecting the notion that "all
common-law duties owed by government actors were somehow constitutionalized by the Fourteenth
Amendment").

doesn't specify the exact timing, but it states that "shortly after the trial" in June, Fields and Kelley approached Klegman about police protection. *See* Cplt., at ¶ 10 (Dckt. No. 1). Klegman told Kelley that there was a near zero chance of danger. *Id.* It wasn't until September that an assailant attacked Kelley. *Id.* at ¶ 13.

There is a gap of about three months between Klegman's denial of police protection and Kelley's death. That gap is too long, and the risk too indefinite, to satisfy the requirements of proximate causation.

Like *Buchanan-Moore*, the complaint at hand paints a picture of an ongoing danger of retaliation against Kelley. Such a risk is too attenuated to satisfy the need for proximate causation. *See First Midwest Bank*, 988 F.3d at 987; *Buchanan-Moore*, 570 F.3d at 829. The complaint provides no timeframe for the danger. It could have occurred at any point after Davis's trial.

Proximate causation is especially problematic when the issue involves police intervention. In *Windle v. City of Marion*, 321 F.3d 658 (7th Cir. 2003), the Seventh Circuit addressed the failure of the police to intervene and protect a child from an inappropriate relationship. The Seventh Circuit (albeit at the summary judgment stage) drew attention to the fact that there was no way of knowing if the police could have made a difference. "If Raymer, under Appellant's theory, had not taken the so-called affirmative action of doing nothing and had done something, we have no way of knowing what would have occurred. Indeed, the police might have failed at protecting Chaunce. We therefore have no assurance that the danger would not have existed in the absence of the so-called affirmative action of doing nothing." *Id.* at 662.

The same principles apply here. The allegations involve a murder that took place months after the victim sought police protection. There is no way to know if police protection would have made any difference.

The passage of time is simply too long, and the connection is too attenuated. At its core, the complaint alleges a "risk of indefinite duration and degree," which cannot give rise to a claim.[7] *See First Midwest Bank*, 988 F.3d at 987.

## III.    Egregious Behavior

The third and final element is the requirement that the state's conduct "shocks the conscience." *King*, 496 F.3d at 818. Here, the decision to compel a witness to testify, and the decision not to provide ongoing police protection, does not shock the conscience.

"Only the most egregious official conduct will satisfy this stringent inquiry. Making a bad decision, or even acting negligently, does not suffice to establish the type of conscience-shocking behavior that results in a constitutional violation." *Johnson*, 936 F.3d at 708 (quoting *Jackson v. Indian Prairie Sch. Dist. 204*, 653 F.3d 647, 654–55 (7th Cir. 2011)).

Conscious-shocking conduct "requires a culpable state of mind equivalent to deliberate indifference," which is also described as "criminal recklessness." *Est. of Her*, 939 F.3d at 876; *Flint v. City of Belvidere*, 791 F.3d 764, 770 (7th Cir. 2015) ("[S]uffice it to say: governmental

---

[7] On a related note, a traditional tort doctrine is intervening or superseding cause. A cause is superseding when "it is a 'cause of independent origin that was not foreseeable.'" *See Staub v. Proctor Hosp.*, 562 U.S. 411, 420 (2011) (quoting *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 837 (1996)). Sometimes criminal acts are superseding causes that break the chain of causation. The Seventh Circuit has "recognized, consistently with the Restatement (Third) of Torts, that although 'criminal acts are not superseding causes *per se*[,] . . . acts that are either criminal or intentionally tortious . . . are more likely to be adjudged superseding causes." *See Kemper v. Deutsche Bank AG*, 911 F.3d 383, 393 (7th Cir. 2018) (quoting *Scottsdale Ins. Co. v. Subscription Plus, Inc.*, 299 F.3d 618, 620 (2002); *see also* Restatement (Third) of Torts § 34, cmt. e. Courts typically apply the state-created danger doctrine without getting into whether the case involves a crime that could be a superseding cause. *See, e.g.*, *Paine v. Cason*, 678 F.3d 500, 511 (7th Cir. 2012). The parties at issue here haven't raised the issue, so the Court won't reach it.

defendants must act with a *mens rea* akin to criminal recklessness for constitutional liability to attach."). The "standard lacks precise measurement," but "only conduct falling towards the more culpable end of the tort law spectrum of liability will be found to shock the conscience." *Jackson*, 653 F.3d at 655. Wherever the line is, the conduct must be way over the line.

The conduct at issue in this case falls far short of that standard. Serving a subpoena is not shocking behavior. In fact, it is routine – it is part of daily life for prosecutors. Subpoenaing a witness to testify against a dangerous person is not unusual. It is how prosecutors do their jobs, and it is how the state enforces the criminal laws. The state couldn't convict dangerous people without compelling testimony against dangerous people.

Trial subpoenas are a bread-and-butter part of every criminal trial. The criminal justice system requires witnesses, and the testimony of witnesses requires subpoenas. Forcing people to testify – often against their will, and sometimes against their best interests – is a necessary part of our system of justice. Making prosecutors think about tort liability when issuing subpoenas may not bring the wheels of justice to a screeching halt. But they would turn a lot slower, to the detriment of the public at large.

Failing to tell the witness what the prosecutor learned is not shocking, either. Criminal defendants routinely file motions for a new trial. And criminal defendants typically don't want witnesses to testify against them. It does not shock the conscience that the prosecutor did not pass along regular updates about ongoing litigation.

The denial of a request for police protection does not shock the conscience, either. Law enforcement has a limited ability to offer protection to witnesses who testify in their criminal trials. Deciding who deserves what protection – and for how long – is a sensitive area that is reserved for the judgment of the executive branch. *See Collins v. City of Harker Heights*, 503

22

U.S. 115, 128–29 (1992). "[R]ecognition of a constitutional right to adequate police protection and other public assistance would place federal judges in control of much of the apparatus of government. . . . Were liability under federal law allowed to be imposed in such cases, federal judges would become deeply involved in the allocation of public funds and services, a task for which guidance can't be found in the Constitution. The judges would be at large, usurping traditional legislative and executive functions." *Slade*, 702 F.3d at 1031.

A right to police protection would put courts in charge of allocating public resources, a responsibility entrusted to the executive branch. "Such a right would be impractical. The federal courts would have to decide how much money each state and every local community would be required to allocate to protection of life, limb, and property. They would have to decide how much money must be appropriated for police and prosecutors and prisons, how police resources should be deployed across neighborhoods, the minimum length of state prison sentences, when if ever probation or parole should be substituted for imprisonment or a prison sentence suspended, and which state prisoners should be allowed to serve part or all of their sentences in halfway houses, at home, or on work release." *See Sandage*, 548 F.3d at 596.

And it wouldn't stop there. Potential dangers lurk everywhere. "The federal courts would fix the speed limits on state highways, prescribe the lighting on state streets, regulate fire departments, public hospitals, and paramedic services." *Id.*; *see also Tuffendsam v. Dearborn Cnty. Bd. of Health,* 385 F.3d 1124, 1126–27 (7th Cir. 2004) ("But the root objection to cases of this kind, as noted by the district judge, is simply the infeasibility of judicial review of law enforcement. . . . [It] would place the federal courts in control of sanitation in Dearborn County, Indiana, responsible for telling the County's public health officers how to allocate their limited time and money among the various public health problems clamoring for their attention. Judge

23

Hamilton [the district judge] would *be* the Dearborn County health board.") (emphasis in original).

It is true that Kelley anticipated that she was in danger, and told the prosecutor about it. And it is undeniable that she was right, and her worst fears came true. The accuracy of that prediction does not enter into the equation. "[L]iability under the Due Process Clause doesn't attach 'just because the danger materializes.'" *See Est. of Her*, 939 F.3d at 876 (citation omitted).

\*      \*      \*

This case involves an unspeakable tragedy. It stems from the loss of three lives that never should have been taken. Kelley witnessed a terrible crime, and undoubtedly acted with great bravery when she walked up to the witness stand. The Court admires her courage, and understands the family's profound loss. They suffered a loss not once, but twice.

No lawsuit can undo what happened. The narrow question here is simply whether, under the Constitution, her representatives can hold the prosecutor accountable for a murder committed by a private actor. The simple answer is no. But the lack of a claim does not, in any way, undervalue her precious life or diminish the terrible loss that her family suffered.

### Conclusion

For the foregoing reasons, Defendants' motion to dismiss is granted.

Date:   March 31, 2022

Steven C. Seeger
United States District Judge

24